IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA, *ex rel.*,      *
AMALIA POTTER,                                         *
                                                                      *
      Plaintiffs,                              *
                                                                      *
  v.                                                           *          Civil Action No. PX-16-0475
                                                                      *
                                                                      *
CASA DE MARYLAND, *et al.*,                      *
                                                                      *
      Defendants.                            *

                        ******

## MEMORANDUM OPINION

Pending before the Court in this *qui tam* action is the Motion to Dismiss filed by

Defendants CASA de Maryland, CASA in Action, Gustavo Torres, and Virginia Kase

(collectively, "Defendants") (ECF No. 14). The matter has been fully briefed, and no hearing is

necessary. *See* D. Md. Loc. R. 105.6. Upon consideration of the parties' arguments, the Court

GRANTS Defendants' motion.

## I.      Background

Defendant CASA de Maryland, Inc. and its affiliate, Defendant CASA in Action, Inc.

(collectively, "CASA") are nonprofit organizations that provide advocacy and assistance to

Latino and immigrant communities in Maryland. ECF No. 1 ¶¶ 4, 27. Plaintiff-relator Amalia

Potter was employed as CASA's Human Resources Manager from May 20, 2013, to August 20,

2014. ECF No. 1 ¶¶ 3, 26. Defendant Gustavo Torres is CASA's Executive Director and

Defendant Virginia Kase is its Chief Operations Officer. ECF No. 1 ¶ 27. Potter reported to

Kase. ECF No. 1 ¶ 38.

CASA receives federal funds through the U.S. Department of Education's ("DOE") Fund for the Improvement of Education, the DOE's Investment in Innovation Fund, and the U.S. Department of Labor's ("DOL") Occupational Safety and Health Susan Harwood Training Grants (collectively "government" or "government funds"). ECF No. 1 ¶ 29. As a condition to receiving these funds, CASA must complete Program Participation Assurances ("PPAs") on Office of Management and Budget ("OMB") Form SF 424B. CASA must also provide annual financial status reports ("FSPs") using OMB Form SF 270. ECF No. 1 ¶¶ 5, 6. Because CASA expended more than $500,000 in federal awards in 2014, CASA was required to undergo an audit for that fiscal year pursuant to OMB Circular A-133 (the "A-133 audit"). ECF No. 1 ¶ 55.

In CASA's PPAs, FSPs, and in the Data Collection Form submitted as part of the A-133 audit, CASA must certify that it complies with "applicable requirements" of federal law and regulations. ECF No. 1 ¶ 6. In particular, the A-133 audit required CASA to identify the federal funds that it received and expended, and to provide "reasonable assurance" through internal controls that "the auditee is managing Federal awards in compliance with laws, regulations, and the provisions of contracts or grant agreements that could have a material effect" on the federal program under which funds are received. CASA was also required to acknowledge that it complied with laws, regulations, and other agreements related to the government funds, and to otherwise assure that the audit was properly performed and any audit findings are corrected. ECF No. 1 ¶¶ 56, 57.

Potter alleges that during an internal audit conducted in advance of the A-133 audit, she discovered that CASA's I-9 forms[1] for a number of its employees dating back to the 1980s

---

[1] Federal immigration regulations require employers to complete the U.S. Citizen and Immigration Services Form I-9, the "Employment Eligibility Verification Form," to verify the identity and employment authorization of individuals hired in the United States, whether citizens or noncitizens. *See* ECF No. 1 ¶ 9. On the form, the employee attests to her employment authorization and provides to the employer documents proving identity. The

appeared deficient.  ECF No. 1 ¶¶ 41–43.  Potter alerted Kase to the problems with the I-9 forms, and Kase instructed Potter to fix the issue going forward as to new employees, but to do nothing with respect to the historic deficiencies.  ECF No. 1 ¶ 49.

In June 2014, Potter was informed that CASA would be subject to an A-133 audit for the preceding fiscal year.  Potter thereafter learned that employees' I-9 forms would be one of the categories of employee records reviewed as part of the A-133 audit.  ECF No. 1 ¶¶ 53, 60.  To prepare for the A-133 audit, Potter engaged in a "self-audit" which revealed that 95–97% of all of the I-9s CASA had on file, going back to the 1980s, were incomplete, and many copies of identification documents attached to the I-9s were either illegible or expired.  ECF No. 1 ¶¶ 60–64.  Potter asserts that she discussed these deficiencies again with Kase and was instructed to fill out the I-9s herself.  ECF No. 1 ¶¶ 64–66.  When Potter refused, Potter and Kase then agreed that Potter would work with CASA management to update the I-9s of CASA's current employees to ensure that their I-9s were brought into compliance.  ECF No. 1 ¶¶ 67–73.  Despite Potter's repeated attempts, the I-9s were never updated.  ECF No. 1 ¶¶ 74–80.

Potter alleges that during her final attempt to address I-9 noncompliance, Kase "became irate" and accused Potter of "overcomplicating matters."  ECF No. 1 ¶ 78.  Potter subsequently attempted to address the I-9 issue by sending an email to all CASA managers, requesting the managers to direct their employees to bring I-9 documentation for recertification to an all-staff meeting.  Kase "chastised" Potter for this email because Kase "did not want this to be a mass recertification at open enrollment."  ECF No. 1 ¶¶ 79–80.  Potter was then fired.  ECF No. 1 ¶¶ 82–83.

---

employer then must examine the documents for authenticity and employment eligibility.  *See* USCIS, *I-9, Employment Eligibility Verification*, http://www.uscis.gov/i-9 (last visited March 6, 2018).

Following Potter's termination, CASA engaged an outside audit firm to conduct the required A-133 audit for the fiscal year ending on June 30, 2014. ECF No. 1 ¶¶ 92, 93. The 2014 Data Collection Form submitted pursuant to the audit was signed by an authorized representative of CASA who certified that "the information including in Parts I, II, and III of this data collection form, in its entirety, are accurate and complete." ECF No. 1 ¶ 93. Potter asserts that as part of this A-133 audit, CASA failed to "disclose its widespread noncompliance with federal employee eligibility regulations" (*i.e.*, failure to properly complete employees' I-9s), and thus the certification in the 2014 Data Collection Form was false. ECF No. 1 ¶ 94; *see* ECF No. 1 ¶¶ 7, 9 (CASA falsely certified compliance with applicable laws and requirements and employed individuals without completing required I-9 forms). Potter avers that the government approved CASA's 2014 expenditures based on CASA's representations in the Data Collection Form, and subsequently approved additional awards. ECF No. 1 ¶ 96. Potter also alleges that certifications made in PPAs on SF 424Bs and FSPs on SF 270s similarly were false. ECF No. 1 ¶ 5.

Based on CASA's assertions in the Data Collection Form, PPAs, and FSAs, Potter filed suit alleging violations of the False Claims Act ("FCA") (Count I), conspiracy to violate the FCA (Count II), and retaliation in violation of the FCA (Count III). Potter also alleges that she was wrongfully terminated in violation of Maryland public policy (Count IV) because she was fired in retaliation for urging CASA to fix the deficient 1-9s, and for refusing to improperly fill in I-9s. Potter also asserts that Defendants retaliated against her by "defaming" and "antagonizing" her, specifically by opposing her application for unemployment insurance and providing negative information about her to a prospective new employer. ECF No. 1 ¶ 88.

Defendants moved to dismiss, arguing that Potter did not allege adequately that any employees with deficient I-9s worked on government-funded programs, that CASA violated any rules governing the relevant programs, or that she made reports of false or fraudulent claims to CASA. *See* ECF No. 14-1 at 1–2. Defendants further argue that Potter has not stated a claim for wrongful termination in violation of Maryland public policy because the FCA already provides for civil remedies for the same alleged violations. For the reasons below, the Court will dismiss Counts I, II, and III without prejudice and with leave to amend the Complaint consistent with this opinion. Count IV will be dismissed with prejudice.

## II.      Standard of Review

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the complaint includes facts sufficient to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). A plaintiff must plead facts to support each element of the claim to satisfy the standard. *See McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015). In so assessing, the Court takes as true all well-pleaded factual allegations and makes all reasonable inferences in the plaintiff's favor. *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). The Court does not credit conclusory statements or legal conclusions, even when couched as allegations of fact. *See Iqbal*, 556 U.S. 678–79; *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). Actions brought under the FCA must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 456 (4th Cir. 2013). This requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

In ruling on a Rule 12(b)(6) motion, the Court generally may not consider extrinsic evidence.  However, when a defendant attaches a document to its motion to dismiss, the Court may consider that document if it is "integral to and explicitly relied on in the complaint" and the plaintiff does not challenge its authenticity.  *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004); *see also Philips*, 572 F.3d at 180; *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007) ("[W]here a complaint in a fraud action references a document containing the alleged material misrepresentations, the referenced document may be considered part of the complaint.").  This rule seeks to prevent a "situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document . . . even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent."  *Am. Chiropractic Ass'n*, 367 F.3d at 234 (internal marks and citation omitted).

### III.  Discussion

#### A.  Count I, Substantive Violation of the FCA

The FCA allows private litigants to bring actions on behalf of the United States against any entity that makes false representations to the government to secure government funding. 31 U.S.C. § 3730(b).  To state a claim under the FCA, a plaintiff must allege (1) that there was a false statement or fraudulent course of conduct; (2) that was made or carried out with the requisite knowledge; (3) that was material; and (4) that caused the government to pay out money or to forfeit monies due.  *U.S. ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 700 (4th Cir. 2014).  For an FCA claim to survive, the false or fraudulent statement must be *material* to the government's decision to provide funding.  *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("Liability under each of the provisions of the False Claims

Act is subject to the further, judicially-imposed, requirement that the false statement or claim be material."). A statement is material if it "has a natural tendency to influence agency action or is capable of influencing agency action." *Id.* (internal quotation marks and citation omitted). In the context of FCA claims, the materiality requirement is a demanding one; it is "intended to keep FCA liability from attaching to noncompliance with any of potentially hundreds of legal requirements in a contract." *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017), *cert. dismissed*, 138 S. Ct. 370 (2017) (internal quotation marks and citation omitted).

Defendants argue that Potter fails to state a claim as to both the falsity and the materiality prongs of an FCA violation. ECF No. 14-1 at 7–8.[2] The Court addresses each challenge separately below.

### 1. Falsity

An FCA violation occurs when an entity falsely certifies compliance with certain conditions of federal funding to induce payment of government funds. *Harrison*, 176 F.3d at 786; *see Andrews v. City of Norfolk*, No. 2:16CV681, 2017 WL 4837707, at *8 (E.D. Va. Oct. 23, 2017). Where government funding is conditioned on compliance and that compliance has been falsely certified, an FCA action shall lie. *Harrison*, 176 F.3d at 786. Importantly, however, liability does not exist "merely for non-compliance with a statute or regulation"; the compliance at issue must be "a *prerequisite*" to securing the government funding and the defendant must have "certified such compliance." *Id.* at 787 (emphasis added); *see Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016).

---

[2] Defendants attach a blank Data Collection Form for an A-133 audit, SF 424B, and SF 270 to their Motion. ECF Nos. 14-3, 14-4, 14-5. Because Potter has not contested the authenticity of these forms and they are integral to Potter's Complaint, the Court considers them.

According to Potter, CASA's certifications of compliance constitute false statements regarding the adequacy of its employees' I-9s.  Potter essentially argues that CASA's certification of general compliance, without disclosing CASA's more specific I-9 noncompliance, renders the information provided to the government a misrepresentation. Potter's argument sweeps too broadly.

In this regard, the Supreme Court's recent decision in *Universal Health* guides this Court's analysis.  There, the defendant systematically employed unlicensed and unqualified counselors to offer mental health services and prescribe medications.  *Id.* at 1993, 1997. Universal Health sought Medicaid reimbursements for services provided by these individuals by using Medicaid payment codes corresponding to particular types of counseling services.  *Id.* at 1997–98.  The Supreme Court held that the use of those specific payment codes in seeking reimbursement from the Government was "misleading in context" because,

> [a]nyone informed that a social worker . . . provided a teenage patient with individual counseling services would probably—but wrongly—conclude that the clinic had complied with core Massachusetts Medicaid requirements (1) that a counselor treating children is required to have specialized training and experience in children's services, and also (2) that, at a minimum, the social worker possesses the prescribed qualifications for the job . . . .  By using payment and other codes that conveyed this information without disclosing . . . many violations of basic staff and licensing requirements for mental health facilities, Universal Health's claims constituted misrepresentations.

*Id.* at 2000–01 (internal marks and citations omitted).  Accordingly, use of the specific codes implicitly certified that the employees were trained, licensed, and qualified to provide the specific services for which Universal Health sought payment.

In so holding, the Court made clear that claims to the government for payment that "include certain misleading omissions" are actionable only where "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance" against the backdrop of

"material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 1999, 2001. Potter fails to satisfy this standard.

The Complaint—although rich in detail about the inadequacy of CASA's I-9 forms and Potter's attempts to correct these deficiencies—fails to demonstrate how CASA's certifications to the government plausibly relate to CASA's employees' I-9s. Potter alleges that CASA certified its compliance with *applicable* conditions for federal funding, but she does not show, for example, how CASA's certifications relate, refer, or are at all connected to properly executed I-9s or even compliance with federal immigration laws. *See, e.g.*, ECF No. 1 ¶¶ 11, 31, 94.[3] The Complaint simply cannot be read as CASA *falsely* certifying compliance if Potter has not demonstrated that the scope of compliance incorporates the adequacy of I-9 documentation. *See Rostholder*, 745 F.3d at 702 ("[B]ecause compliance with the [regulation alleged to be violated] is not required for payment by Medicare and Medicaid, Omnicare has not falsely stated such compliance to the government, as contemplated by the FCA.").

The deficiency in Potter's Complaint is further underscored by the very forms at issue. The Data Collection Form for the A-133 audit (SF-SAC) reads in full:

> This is to certify that, to the best of my knowledge and belief, the auditee has: (1) engaged an auditor to perform an audit in accordance with the provisions of OMB Circular A-133 for the period described in Part I, Items 1 and 3; (2) the auditor has completed such audit and presented a signed audit report which states that the audit was conducted in accordance with the provisions of the Circular; and (3) the information included in Parts I, II, and III of this data collection form is accurate and complete. I declare that the foregoing is true and correct.

---

[3]     Potter points specifically to 2 C.F.R. § 200.430 and 34 C.F.R. § 75.700 as providing relevant federal regulations. ECF No. 1 ¶ 10. 2 C.F.R. § 200.430, entitled "Compensation – personal services," states that employees who are compensated via federal award must be appointed in a manner that "meets the requirements of Federal statute, *where applicable*." (Emphasis added.) Similarly, 34 C.F.R. § 75.700, entitled "Compliance with statutes, regulations, and applications," states even more broadly that a "grantee shall comply with *applicable* statutes, regulations, and approved applications, and shall use Federal funds in accordance with those statutes, regulations, and applications." (Emphasis added.) Nowhere does Potter allege facts to support a plausible inference that CASA's insufficient employee I-9s constitutes a failure to comply with an *applicable* statute.

ECF No. 14-3 at 6. Part I of the form requests general information about the auditee (CASA), including the auditee's address, EIN, and contact information. ECF No. 14-3 at 2. Part II of the form requests information about CASA's financial statements. ECF No. 14-3 at 3. Finally, Part III asks whether CASA is subject to additional audits, whether CASA qualifies as a low-risk auditee under federal guidelines, and whether any federal agencies have current year audit findings related to the auditee, and requests information regarding federal awards expended during the relevant fiscal year. ECF No. 14-3 at 3–4. A request for additional information is triggered if the *financial* information reported leads to an audit finding. ECF No. 14-3 at 5 ("This page is not required if no findings are reported on Part III, Item 6k"). Nothing on this form allows the Court to infer that certification of compliance means that failure to disclose I-9 noncompliance is a "misleading half-truth."

Similarly, SF 424B requires CASA to certify compliance with a number of specific matters, including that it has established safeguards to prohibit employee conflicts of interest, as well as compliance with law related to merit systems for personnel, nondiscrimination in employment, limitations on political activity, labor standards for construction agreements, flood insurance purchase requirements, environmental preservation, historic preservation, care of warm-blooded animals used in laboratory research, lead-based paint poisoning prevention, and "other Federal laws . . . *governing this program*." ECF No. 14-4 at 2–3. Nowhere in this exhaustive list is I-9 or immigration compliance mentioned, directly or indirectly.

Finally, the SF 270 requires CASA to attest that the financial data submitted on that form is accurate and that "all outlays were made in accordance with the grant conditions or other agreement and that payment is due and has not been previously requested." ECF No. 14-5 at 3. Again, nothing in the form requests any information, directly or indirectly, about I-9 or

immigration compliance. The Court cannot infer plausibly that "an objective gap exists between what [CASA] represented and what [CASA] would have stated had [it] told the truth" on these forms. *See U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787, 797 (E.D. Va. 2007), *aff'd*, 562 F.3d 295 (4th Cir. 2009) (quoting *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1033 (D. Nev. 2006). Potter, therefore, has not adequately alleged that CASA's certificates of compliance were misleading for failing to disclose I-9 noncompliance.

### 2. Materiality

Even if Potter had plausibly alleged the existence of a false statement due to CASA omitting its noncompliance with I-9 requirements, her Complaint does not plausibly aver that the omissions are material. *See Univeral Health*, 136 S. Ct. at 2002 ("a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act"); *U.S. ex rel. De Cesare v. Americare In Home Nursing*, 757 F. Supp. 2d 573, 586 (E.D. Va. 2010) ("FCA liability arises not merely because a false statement is included within a claim . . . [o]nly *materially false* certifications—those that would lead the government to make payments it would not otherwise have made—are actionable." (internal quotation marks and citations omitted, emphasis added)).

Importantly, "[a] misrepresentation cannot be deemed material merely because the Government designates compliance . . . as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Universal Health*, 136 S. Ct. at 2003. Rather, the omission of "violations of statutory, regulatory, or contractual requirements" is a basis for liability only if the

omissions "render the defendant's representations *misleading with respect to the goods or services provided.*" *Id.* at 1999 (emphasis added); *see Andrews*, 2017 WL 4837707, at *8.

Potter's Complaint does not include any facts showing that the sufficiency of CASA's employees' I-9s related at all to the decision to grant CASA government funding. Potter merely asserts, again in conclusory fashion, that CASA would not have received federal funds if the government knew about the I-9 deficiencies, but marshals no facts to show that funding is tied to the sufficiency of I-9s or to compliance with immigration regulations generally. Nor has Potter alleged any other facts that would allow an inference of materiality, such as other claims for payment being denied because of improper I-9 documentation. *See Universal Health*, 136 S. Ct. at 2003–04 ("proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims . . . based on noncompliance with the particular . . . requirement"); *Triple Canopy*, 857 F.3d at 178–79. Because the Complaint does not show *how* CASA's failure to disclose its I-9 noncompliance would have influenced the government's funding decisions, Potter has not adequately demonstrated materiality. *See U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008). Potter's substantive FCA claim therefore must be dismissed.

Although the Court is skeptical that Potter's pleading deficiency can be cured, the Court notes that Potter filed her complaint prior to the Supreme Court issuing its opinion in *Universal Health*. Any amendment would be Potter's first, and so she will be given an opportunity to cure these pleading deficiencies consistent with this Opinion, if possible.

### B.  Count II, Conspiracy to Violate the FCA

Count II, conspiracy to violate the FCA, "is premised on . . . claims of underlying FCA violations," and so it "rises and falls with the individual claims." *U.S. ex rel. Godfrey v. KBR,*

*Inc.*, 360 F. App'x 407, 413 (4th Cir. 2010); *see Allison Engine Co., Inc. v. U.S. ex rel Sanders*, 553 U.S. 662, 672–73 (2008) ("Where the conduct that the conspirators are alleged to have agreed upon involved the making of a false record or statement, it must be shown that the conspirators had the purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim.").  Potter's conspiracy claim turns on the same factual basis regarding CASA's failure to disclose its I-9 noncompliance as her substantive FCA claim.  Accordingly, Potter's FCA conspiracy claim must be dismissed without prejudice and with leave to amend consistent with this Opinion.

### C.  Count III, FCA Retaliation

In her third claim for relief, Potter alleges that CASA retaliated against her for engaging in conduct protected by the FCA.  To establish a *prima facie* case of retaliation under the FCA, a plaintiff must allege that (1) the employee engaged in protected conduct; (2) the employer had notice of the employee's protected conduct; and (3) the employer retaliated against the employee in response.  *See Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 170 (4th Cir. 2016); *Andrews*, 2017 WL 4837707, at *9.  The employer's retaliatory actions must be sufficiently adverse to dissuade a reasonable employee from engaging in protected conduct.  *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 434 (4th Cir. 2015).

Two types of protected activity can support the first element of a *prima facie* FCA retaliation claim.  *See* 31 U.S.C. § 3730(h)(1); *Carlson*, 657 F. App'x at 170.  The first kind of protected activity is that which an employee takes to further an FCA claim, such as "initiat[ing], testif[ying] for, or assist[ing] in the filing of" an FCA case.  *Irving v. PAE Gov't Servs., Inc.*, No. 1:16CV1617, 2017 WL 4999563, at *6 (E.D. Va. Nov. 1, 2017) (quoting *Zahodnick v. Int'l Bus.*

*Machs. Corp.*, 135 F.3d 911, 914 (4th Cir. 1997)) (internal marks omitted). Employee conduct is

properly considered in furtherance of an FCA action if it involves a "distinct possibility" of FCA

litigation. *Mann v. Heckler & Koch Defense, Inc.*, 630 F.3d 338, 344 (4th Cir. 2010). To meet

this standard, a plaintiff need not actually file an FCA *qui tam* action, but the employee's

conduct must involve matters that "reasonably could lead to a viable FCA action." *Glynn v.

EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013) (internal quotation marks omitted). This includes

circumstances in which an FCA claim "could be filed *legitimately* and excludes those in which

an employee . . . just imagines fraud but lacks proof." *Mann*, 630 F.3d at 344 (quoting *Neal v.

Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994) (internal marks omitted, emphasis added).

The second type of protected activity is conduct undertaken in an effort to stop one or

more substantive FCA violations. *See Carlson*, 657 F. App'x at 170. This conduct is considered

protected activity under the FCA if it is "motivated by an *objectively* reasonable belief that the

employee's employer is violating, or soon will violate, the FCA." *Id.* at 172 (emphasis added);

*see Nifong v. SOC, LLC*, 234 F. Supp. 3d 739, 752–53 (E.D. Va. 2017); *Chapins v. Northwestern

Cmty. Servs. Bd.*, 243 F. Supp. 3d 739, 745–46 (W.D. Va. 2017); *U.S. ex rel. Grant v. United

Airlines, Inc.*, No. 2:15-cv-00794-DCN, 2016 WL 6823321, at *7 (D.S.C. Nov. 18, 2016).[4]

---

[4]     Before 2009, the FCA statutory definition of protected activity included only conduct "in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." *See Carlson*, 657 F. App'x at 171 (quoting False Claims Amendments Act of 1986, Pub. L. 99–562, § 4, 100 Stat. 3153, 3157–58). Since the FCA amendments, the Fourth Circuit, in its unpublished opinion in *Carlson*, assumed without deciding that "efforts to stop 1 or more violations" of the FCA are protected when such efforts are "motivated by an objectively reasonable belief that the employee's employer is violating, or soon will violate, the FCA." *Id.* at 172 (internal quotation marks and citations omitted). Numerous other courts within the Circuit have adopted the *Carlson* standard. *See Nifong*, 234 F. Supp. 3d at 752–53 ("[T]he standard governing the second kind of protected activity . . . is more expansive, but less settled. . . . Because the Fourth Circuit in *Carlson* explicitly applied the 'reasonable belief' standard just months ago, it is appropriate to do so here."); *see also Chapins*, 243 F. Supp. 3d at 745–46; *Grant*, 2016 WL 6823321, at *7. This Court will also follow *Carlson*.

For the second element of a *prima facie* retaliation claim, a plaintiff must plausibly aver that that the employer had notice of the protected activity. *See Irving*, 2017 WL 4999563, at *4. This element is met when the employee's words and acts are "sufficiently suggestive of fraud or falsity" such that the employer knew or should have known that FCA litigation was a reasonable possibility. *Layman v. MET Labs., Inc.*, No. RDB-11-03139, 2012 WL 4018033, at *6 (D. Md. Sept. 12, 2012) (quoting *U.S. ex rel. Ackley v. Int'l Bus. Machs. Corp.*, 110 F. Supp. 2d 395, 401 (D. Md. 2000)); *U.S. ex rel. Parks v. Alpharma, Inc.*, 493 F. App'x 380, 388 (4th Cir. 2012); *Irving*, 2017 WL 4999563, at *4. Statements by an employee "clearly couched in terms of concerns and suggestions, not threats or warnings of FCA litigation" do not constitute notice as required to make out an FCA retaliation claim. *Parks*, 493 F. App'x at 389–90; *see Irving*, 2017 WL 4999563, at *7.

Potter alleges retaliation for engaging in both kinds of protected activity. As to the first kind—taking steps "in furtherance of" an FCA claim—Potter avers that she "voluntarily disclosed" the insufficiency of CASA's I-9s to the Department of Justice ("DOJ") after her termination. ECF No. 1 ¶ 117. Potter further asserts that in retaliation, CASA made "negative, unsavory and defamatory remarks" to prospective employers. From the Complaint, the Court cannot discern the timing of Potter's disclosure in relation to CASA's alleged unsavory, negative, and defamatory comments.[5] The Complaint also does not aver any facts to suggest CASA knew or should have known of Potter's DOJ disclosure at the time CASA made such statements; nor does Potter allege with specificity whether the DOJ disclosure was in connection with stopping CASA's alleged ongoing FCA violation or a broader complaint about noncompliance with immigration regulations. Potter's retaliation claim on this ground must be

---

[5]     Because Potter's disclosures to the DOJ post-dated her termination, the DOJ disclosures cannot be the basis for a retaliation claim premised on that termination. *See Salagh v. Va. Int'l Univ.*, No. 16-1321-GBL-TCB, 2017 WL 976620, at *5 (E.D. Va. Mar. 13, 2017).

dismissed.  However, the Court will grant Potter the opportunity to amend the Complaint, if possible, as to her claim of post-termination retaliation motivated by the DOJ disclosure. Because conduct in furtherance of an FCA action does not include instances where the employee "imagines fraud but lacks proof," *Mann*, 630 F.3d at 344 (internal marks and citation omitted), Potter is advised to plead with specificity the circumstances surrounding the disclosure to the DOJ that, in her view, support an objectively reasonable possibility of FCA litigation.[6]

Regarding retaliation based on Potter's attempts to prevent an FCA violation while employed at CASA, Potter likewise has failed to state a claim.  *See* ECF No. 1 ¶ 118.  Potter avers that she discovered CASA's I-9 problems during an internal audit that does not have an obvious connection to the A-133 audit, *see* ECF No. 1 ¶¶ 41, 53, 60, and subsequently confirmed those problems while preparing for the A-133 audit.  During this preparation, Potter asserts that not only did she gather forms for the fiscal year ending in 2014 for the A-133 audit, but she also took it upon herself to "self-audit" *all* I-9s on file from the 1980s forward, *see* ECF No. 1 ¶¶ 60, 61.  Potter then disclosed the entirety of CASA's I-9 noncompliance to her supervisors and thereafter directed HR employees not to falsify defective records, informed CASA management about CASA's legal obligation to correct I-9s, and insisted that CASA follow "the IRS guidelines pertaining to corrective action of the defective I-9 records."  ECF No. 1 ¶ 117.

Taking these facts as true, Potter's claim fails as a matter of law for two reasons.  First, Potter fails to allege facts from which the Court could infer that a reasonable employee in Potter's shoes *objectively* and reasonably could believe *an FCA* violation would occur.  *See* *Carlson* at 173 ("Carlson's complaint does not contain enough factual matter (taken as true) to suggest that [his employer] made or was about to make a false claim on the government.  As

---

[6]     The Court recognizes that, according to Defendants' Reply, Potter's DOJ disclosure focused on CASA's supposed violations of immigration law rather than fraud under the FCA.  *See* ECF No. 21 at 11 n.2.  To the extent Defendants are correct, Potter cannot cure her FCA retaliation claim based on the DOJ disclosure.

such, we cannot say that his evidence was enough to make his alleged belief in [his employer's] fraud objectively reasonable—in fact, it was entirely speculative." (internal quotation marks and citation omitted)); *cf. Chapins*, 243 F. Supp. 3d 746–47 (objectively reasonable belief was buttressed by plaintiff reporting suspicions of false claims to supervisors, based on numerous instances of inaccurate documentation being submitted for reimbursement). No doubt Potter has pleaded sufficient facts to show that she subjectively believed CASA was non-compliant with immigration laws. That Potter was asked to collect I-9s in preparation for an A-133 audit, moreover, gave her some reason to think that the I-9s were relevant for that audit; however, Potter fails to allege sufficiently that "a reasonable employee in the same circumstances" would believe that CASA was committing or soon would commit an FCA violation. *See U.S. ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610, 621 (E.D. Va. 2016). Missing are any facts to suggest that any of the certifications in the A-133 audit process explicitly or implicitly included an attestation of I-9 compliance. Moreover, Potter's internal self-audit of I-9s from decades ago, and well beyond the scope of the 2014 A-133 audit timeframe, suggest the opposite: that from a reasonable and objective view, CASA's I-9 problem was not related to FCA compliance for the 2014 fiscal year, but rather a more general failure to maintain proper employment documents on the whole. ECF No. 1 ¶¶ 13, 60. Accordingly, the Complaint fails to aver plausibly an objectively reasonable belief that Potter's efforts with respect to I-9 compliance related to an FCA violation.

Second, even assuming that Potter's actions in this respect qualified as protected activity, the Complaint nonetheless fails to allege facts sufficient to support that CASA was on notice of Potter's protected conduct. That is, the Complaint does not demonstrate, as it must, that *from the perspective of the employer* the employee's conduct raises a reasonable possibility of an FCA

action. *See Mann*, 630 F.3d at 344. This is because no facts in the Complaint allow a plausible inference that Potter's communications with CASA about I-9 deficiencies were linked in any way to a potential false or fraudulent, FCA-actionable claim. *See* ECF No. 20-1 at 18–19. The Complaint characterizes Potter's exchanges with CASA management as focused on I-9 issues. More particularly, Potter asked for guidance on how HR should cure deficient I-9 forms; Potter placed an anonymous call to USCIS to inquire about how to resolve deficient I-9 forms; Potter "communicated her concerns about correcting and completing" the forms; Potter and Kase discussed how to proceed with correcting the I-9 forms; Potter "expressed concern" about managers communicating I-9 requirements to their staff; and Potter "plead[ed] with managers not to tell staff which documents to bring for I-9 recertification." *See* ECF No. 1 ¶¶ 64–80.

Potter has pleaded with specificity that her communications with CASA were about violations of immigration law. Potter pleads no facts, however, to show that CASA was aware that her I-9 efforts were related to a possible FCA action. *See* ECF No. 1 ¶¶ 117–18. The Complaint, while rich in detail, does not plausibly aver that CASA was on reasonable notice of a possible *qui tam* action. *See Parks*, 493 F. App'x at 389–90 (plaintiff's evidence did not provide a basis to find that her employer "would have reasonably believed that she was contemplating or acting in furtherance of an FCA action" rather than raising other concerns); *Nifong v. SOC, LLC*, 190 F. Supp. 3d 549, 552, 558–59 (E.D. Va. 2016) (finding notice to employer adequately pleaded where employee stated to employer that he believed the practices about which he was concerned "could easily be construed as fraud"). Accordingly, although Potter is granted leave to amend this Count, she must do so *only* if she can allege *facts* to cure these deficiencies. Vague and generalized allegations will not suffice.

### D. Count IV, Wrongful Termination

Potter lastly alleges that CASA terminated her for internally reporting problems with I-9 forms and for her refusal to violate the strictures of immigration laws, giving rise to a tort claim for wrongful termination. ECF No. 1 ¶ 126. Although an at-will employment relationship in general may be terminated for any reason by either the employee or the employer, Maryland recognizes a limited exception to this rule when an employee's discharge "contravenes some clear mandate of public policy." *Adler v. Am. Standard Corp.*, 291 Md. 31, 47 (Md. Ct. App. 1981); *see also Porterfield v. Mascari II, Inc.*, 374 Md. 402, 422–23 (Md. Ct. App. 2003). To state a claim for wrongful termination, a plaintiff must allege plausibly that (1) she was discharged, (2) the basis for the discharge violated some clear mandate of public policy, and (3) a nexus exists between the plaintiff's allegedly protected conduct and the decision to discharge her. *See Yuan v. Johns Hopkins Univ.*, 452 Md. 436, 451 (Md. Ct. App. 2017).

Potter's wrongful discharge claim is premised on her reporting the deficiencies in CASA's I-9 forms to her supervisors. To the extent Potter intends her wrongful discharge claim to be based on FCA whistleblowing, her claim fails because the FCA provides its own statutory remedy. *See Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 496–97 (Md. Ct. App. 1990). Here, Potter has available a "civil remedy in the form of the FCA retaliation provisions, and Maryland law precludes the use of the wrongful discharge tort to recover in the name of the same public policy interest." *Glynn*, 536 F. Supp. 2d at 616.

To the extent that Potter alleges she was wrongfully discharged for her reports of illegal activity in violation of public policy reflected in federal immigration law rather than the FCA, her wrongful discharge claim still fails as matter of law. This is because wrongful discharge does not extend to reports of illegal activity made only to supervisors within an organization.

19

*See Adler v. Am. Standard Corp.*, 830 F.2d 1303, 1307 (4th Cir. 1987) ("In the absence of a clear declaration by a legislature or the Maryland Court of Appeals that an action for abusive discharge should be extended to situations where the discharged employee claims to have had the knowledge and the intent to report wrongdoing to a higher corporate official, this court should not create such a ruling."); *Parks v. Alpharma, Inc.*, 421 Md. 59, 79–80 (Md. Ct. App. 2011) (in context of reporting crimes, wrongful discharge claim can be sustained "only if the employee had reported to an appropriate law enforcement or judicial officer"); *Symeonidis v. Paxton Capital Grp., Inc.*, 220 F. Supp. 2d 478, 484–85 (D. Md. 2002) (no public policy mandate implicated by reporting illegal activity to superiors); *Szaller v. Am. Nat'l Red Cross*, 293 F.3d 148, 153 (4th Cir. 2002) ("Maryland does not provide a general whistle blower cause of action for an at-will employee who reports a violation of federal or state law." (internal quotation marks omitted)).  Because Potter did not aver that she reported any violations of law to outside authorities before her termination, her wrongful discharge claim on this basis must fail.[7]  Count IV is dismissed with prejudice.

### IV.    Conclusion

For the reasons discussed above, Potter has failed to make out a plausible entitlement to relief on any of her claims.  Count IV is dismissed with prejudice.  On Counts I, II, and III, Potter shall have 21 days to file an Amended Complaint, should she choose, consistent with this

---

[7]      Potter also alleges that she was fired for refusing to engage in illegal activity.  However, Potter has not pleaded facts to support this allegation.  Rather, Potter avers that she initially had been directed to update CASA's employees' I-9 forms in an improper manner, and that she refused to do so.  But Potter also alleges that after her refusal, Potter and CASA management worked to address I-9s in a legal manner.  Accordingly, although Potter alleges that *other* CASA managers improperly handled I-9 recertification, the Complaint includes no facts to suggest that Potter was subsequently asked to violate the law and was terminated for doing so.  *See* ECF No. 1 ¶¶ 64–68, 70, 76.

Memorandum Opinion. If Potter fails to amend her Complaint within the time provided, the

Court will dismiss her case with prejudice in its entirety. A separate Order follows.


3/6/2018                                                    _____/S/_____
Date                                                        Paula Xinis
                                                           United States District Judge